**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ORANGEBURG DIVISION**

| | |
|---|---|
| Amrize Cement Inc. f/k/a Holcim (US) Inc. and Geocycle LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> Holly Hill Logistics, LLC, Cornerstone Resources Group, LLC, Kernie D. Gilliam, Joshua Fredlake, and James M. Brownlee, <br><br> Defendants. | Civil Action No. 5:26-cv-2079-JDA <br><br><br> **COMPLAINT** <br><br> **(JURY TRIAL REQUESTED)** |

Plaintiffs Amrize Cement Inc. formerly known as Holcim (US) Inc. ("Amrize") and Geocycle LLC ("Geocycle") (collectively referred to hereinafter as "Plaintiffs"), by and through their undersigned counsel, complaining of Defendants Holly Hill Logistics, LLC ("Defendant HHL"), Cornerstone Resources Group, LLC ("Defendant Cornerstone"), Kernie D. Gilliam ("Defendant Gilliam"), Joshua Fredlake ("Defendant Fredlake"), and James M. Brownlee ("Defendant Brownlee") (collectively referred to hereinafter as "Defendants"), hereby allege as follows:

### Introduction

1. Plaintiffs bring this action against Defendants for civil violations of the federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1964(c), and pendant state law claims arising from their related conspiracy and fraud scheme. Since at least 2022, Defendants Gilliam, Fredlake, and Brownlee (collectively referred to hereinafter as "Member Defendants")—all of whom were employees of Plaintiffs during such time—engaged in a conspiracy to defraud Plaintiffs out of millions of dollars in profits through self-dealing and concealment of financial interests and bypassing of conflict-of-interest protocols, all by

1

moonlighting as owners of one of Plaintiffs' largest South Carolina vendors. Plaintiffs seek to recover those fraudulently obtained profits from Defendants and disgorge any and all ill-gotten gains and profits derived from the fraudulent scheme.

**Parties and Jurisdiction**

2.      Plaintiff Amrize Cement Inc. formerly known as Holcim (US) Inc. is a corporation organized and existing under and by virtue of the laws of the State of Delaware, with a principal place of business at 222 S. Riverside Plaza, Suite 2500, Chicago, Illinois 60606.

3.      Plaintiff Geocycle LLC is a limited liability company organized and existing under and by virtue of the laws of the State of Michigan, with a principal place of business at 6211 Ann Arbor Road, Dundee, Michigan 48131. Plaintiffs Geocycle and Amrize are affiliates.

4.      Defendant Holly Hill Logistics, LLC is a limited liability company organized and existing under and by virtue of the laws of South Carolina, with a principal place of business at 381 Selena Circle, Holly Hill, South Carolina 29059.

5.      Defendant Cornerstone Resources Group, LLC is a limited liability company organized and existing under and by virtue of the laws of South Carolina, with a principal place of business at 114 Crossandra Avenue, Summerville, South Carolina 29483.

6.      Upon information and belief, Defendant Cornerstone has three members: Defendants Brownlee, Fredlake, and Gilliam.

7.      Defendant Kernie D. Gilliam is a natural person, citizen, and resident of Summerville, South Carolina, with a permanent address of 132 Old Course Road, Summerville, South Carolina 29485.

8. Defendant Joshua Fredlake is a natural person, citizen, and resident of Summerville, South Carolina, with a permanent address of 1500 Pondside Court, Summerville, South Carolina 29485.

9. Defendant James M. Brownlee is a natural person, citizen, and resident of Saint George, South Carolina, with a permanent address of 601 N. Parler Avenue, Saint George, South Carolina 29477.

10. While employed by Plaintiffs, Member Defendants maintained undisclosed and concealed ownership and managerial control of Defendant HHL, a primary logistics vendor of Plaintiffs.

11. This Court has personal jurisdiction over Defendant HHL because it is registered and transacts business in the State of South Carolina, committed tortious acts in whole or in part in this State, caused tortious injuries in this State, entered into contracts to be performed in whole or in part in this State, and because Plaintiffs' claims against Defendant HHL arise out of and relate to such contacts with this State.

12. The Court has jurisdiction over Defendant Cornerstone because it is registered and transacts business in the State of South Carolina, committed tortious acts in whole or in part in this State, caused tortious injuries in this State, and because Plaintiffs' claims against Defendant Cornerstone arise out of and relate to such contacts with this State.

13. This Court has personal jurisdiction over the Member Defendants because these Defendants are citizens and residents of the State of South Carolina, are members of a South Carolina LLC, regularly transacted business in this State, committed tortious acts in whole or in part in this State, caused tortious injuries in this State, entered into contracts to be performed in

3

whole or in part in this State, and because Plaintiffs' claims against these Member Defendants arise out of and relate to such contacts with this State.

14.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as there is complete diversity between the parties.

15.     Pursuant to 28 U.S.C. § 1331, the Court has original federal question jurisdiction over this action because it arises in part under federal law, specifically, the civil provisions of the RICO Act, 18 U.S.C. § 1964(c), and because all supplemental state law claims arise out of the same case or controversy as the federal claim over which this Court has original jurisdiction.

16.     Pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965, venue is proper in this Court because a substantial portion, if not all, of the events or omissions giving rise to this action occurred in this District, and because the ends of justice requires that all non-resident party defendants be summoned to this Court to answer for their civil violations of the RICO Act.

**Factual Allegations Common to All Causes of Action**
Member Defendants' Relationships with Plaintiffs

17.     Defendant Cornerstone is a limited liability company made up of three members – the three Member Defendants.

18.     Defendant Cornerstone is one of three members of Defendant HHL.

19.     Each of the Member Defendants was formerly employed by Amrize and/or its affiliate Geocycle prior to Defendant Cornerstone's membership in Defendant HHL.

20.     Defendant Gilliam's employment with Plaintiffs began on August 3, 1992. Most recently, Defendant Gilliam was employed as Plaintiffs' Manufacturing Controller.

21.     Defendant Brownlee's employment with Plaintiffs began on December 10, 1997.

22.     Defendant Fredlake's employment with Plaintiffs began on December 3, 2018.

23.     Most recently, Defendants Brownlee and Fredlake held the roles of Alternative

Raw Materials Director for Plaintiffs. As Alternative Raw Materials Directors, these Defendants were responsible for sourcing materials for sustainable waste management solutions, including industrial byproducts like graphite coke fines.

24. Plaintiffs are subsidiaries of a major publicly traded building materials and solutions company with operational headquarters in Chicago, Illinois. Amrize was previously known as Holcim (US) Inc., which was the United States-based subsidiary of Switzerland-based Holcim Group.

25. Plaintiffs operate a large cement manufacturing plant in Holly Hill, South Carolina, which produces millions of metric tons of cement annually.

26. Plaintiffs' manufacturing of cement requires a significant amount of graphite coke fines, a fine particulate carbon material. Therefore, Plaintiffs contract with suppliers to receive a minimum volume of 3,000 tons per year of graphite coke fines. These graphite coke fines deliveries are made on a weekly basis to Plaintiffs' Holly Hill facility.

27. Because Plaintiffs produce such a large quantity of cement each year that requires significant amounts of supplies and materials, Plaintiffs conduct a customary procurement process which includes vendors bidding for material supply contracts.

28. Amrize collaborates with its affiliate, Geocycle, which sources alternative materials, including the graphite coke fines at the Holly Hill location. Member Defendants' primary employment responsibilities were for the benefit of Geocycle.

29. Beginning in May 2024, Plaintiffs contracted with Defendant HHL to supply large quantities of graphite coke fines on a weekly basis to Plaintiffs' Holly Hill cement production facility. On May 15, 2024, Defendant HHL and Plaintiffs entered into a Material Supply Agreement (the "Materials Agreement").

30.     The Materials Agreement provided that Defendant HHL would supply Plaintiffs' Holly Hill plant with a minimum volume of 3,000 tons per year of graphite coke fines, on a weekly basis.

31.     The Materials Agreement required Plaintiffs to pay $10.00 per short ton bulk, which was delivered to the Holly Hill plant via pneumatic tankers. It also required Plaintiffs to pay Defendant HHL's transportation costs.

32.     Shortly after entering into the Materials Agreement, Plaintiffs and Defendant HHL entered into a Services Agreement, dated July 1, 2024, (the "Trucking Agreement") under which Defendant HHL agreed to haul ash in articulated trucks to ash storage bays, and Plaintiffs agreed to pay Defendant HHL a fee of $87,000 per month, plus overtime, and payment for additional trucks as needed. Defendant HHL negotiated for the contract to have an uncustomary long five (5) year term.

33.     The Materials Agreement was terminated by Plaintiffs pursuant to the termination provisions in the Agreement. The Materials Agreement is therefore no longer in effect.

34.     Amrize provided a Notice of Termination of the Trucking Agreement to HHL on July 9, 2025, pursuant to the Agreement's provision for twelve (12) months' written notice. The Trucking Agreement will therefore terminate in whole on July 9, 2026.

35.      Both Agreements required Defendant HHL to abide by Plaintiffs' Supplier Code of Business Conduct.

<u>Member Defendants' Conspiracy to Defraud Plaintiffs</u>

36.     Upon information and belief, Defendant Cornerstone, by and through the Member Defendants, became a member of Defendant HHL for the sole purpose of participating in a conspiracy to defraud and self-deal with Plaintiffs. A special meeting of Defendant HHL was

called on January 3, 2024, mere months before the Trucking Agreement and the Materials Agreement were executed, wherein Defendant HHL passed a resolution establishing George A. Reeves ("Reeves"), Jason Green ("Green"), and Defendant Cornerstone as the members of Defendant HHL. Upon information and belief, each Member Defendant maintains a one-third interest in Defendant Cornerstone and acts on its behalf.

37.     At the time of the execution of the Materials Agreement and the Trucking Agreement, each of the Member Defendants were Plaintiffs' employees.

38.     The Member Defendants' membership and interests in one of Plaintiffs' logistics vendors in South Carolina was purposefully not disclosed to Plaintiffs.

39.     Each of the Member Defendants was subject to, and required to abide by, a Conflicts of Interest Policy ("COI Policy"). The COI Policy explicitly states: "In situations in which Employees' personal or financial interest may conflict materially with those of the Company, Employees are expected and required to fully disclose them. Employees shall not take part in any business activities of the Company where they may be influenced by personal interest or factors that are, or may be, construed as a hindrance to objective decision making."

40.     The COI Policy lists as an example of potential conflicts of interest which employees are required to report and fully disclose: "Interest in Entities Receiving Payments from the Company," as well as "Moonlighting/Outside Employment."

41.     The COI Policy also states: "The Company generally prohibits employees from operating as independent contractors, vendors, or suppliers for the Company in addition to their regular duties as an Employee," and requires immediate disclosure of any such relationship.

42.     Acting directly against the COI Policy, the Member Defendants indirectly obtained a 1/3 interest in Defendant HHL, one of Plaintiffs' vendors, to perform services and

provide materials to Plaintiffs directly under the purview of the Member Defendants. This created personal and financial interests for the Member Defendants that directly conflicted with those of Plaintiffs. The Member Defendants not only failed to disclose their interest, but they took steps to actively conceal their conflicts of interest.

43.    The Member Defendants, while secretly operating Defendant HHL, conducted extensive self-dealing by ensuring Defendant HHL received favorable contracts with Plaintiffs, bypassing procurement procedures, and evading potential competition from other qualified vendors.

44.    As a direct result of Defendant HHL's contracts with manufacturing companies, including Plaintiffs, the Member Defendants received numerous payments directly into their own pockets. Defendant HHL also made regular payments to Defendant Cornerstone, dating back at least to September of 2023, for the sole benefit of the Member Defendants.

45.    Member Defendants ensured that Defendant HHL would be the only vendor considered for two of Plaintiffs' contracts at the Holly Hill plant–the Materials Agreement and the Trucking Agreement—by making false and self-dealing claims to Plaintiffs, designed to divert business to Defendant HHL.

46.    Upon information and belief, Member Defendants took advantage of their employment positions with Plaintiffs to ensure their secret side business became a vendor of, and ultimately overcharged, Plaintiffs for materials and services by avoiding the Plaintiff's customary competitive bidding policy.

47.    In December 2023, Defendant Brownlee, as Plaintiffs' Alternative Raw Materials Director, was approached about contracting with a trucking company for hauling ash at the Holly Hill facility. Defendant Brownlee steered Plaintiffs to Defendant HHL without disclosing his

ownership interest in said Defendant to Plaintiffs: "Holly Hill logistics where we are doing the crushing also has a trucking company. They haul ash for Geocycle and also Haul Bulk tankers for Holcim Cement."

48.     As a result, Plaintiffs entered into the Trucking Agreement with Defendant HHL, again without the benefit of having ensured the best price possible through Plaintiff's customary procurement and competitive bidding process.

49.     In July 2024, Defendant Gilliam requested "more say in how the 2025 and forward iron supply is contracted" and attempted to steer Plaintiffs to Defendant HHL, stating that "they were not fully considered in the 2024 process" and their "iron material is the cheapest."

50.     Pursuant to Plaintiffs' policy, it was customary procedure to require at least three (3) independent quotes to maintain the integrity of the competitive bidding process for the trucking and hauling of ash from the Holly Hill plant.

51.     When Defendant Fredlake was questioned about the selection of Defendant HHL to perform the hauling, he assured Amrize's Procurement Manager that "Holly Hill Logistics is the only party that has the necessary state permit to do this work." In assuring Amrize that there was no other company with proper permits, Defendant Fredlake fraudulently avoided the competitive bidding process on behalf of his own company, Defendant HHL.

52.     The Member Defendants, as then-employees of Plaintiffs, steered vendor work to Defendant HHL to the detriment of Plaintiffs, by obtaining multi-year contracts for Defendant HHL and accepting payment for inflated prices of materials and services that they themselves were charging under the guise of Defendant HHL, unbeknownst to Plaintiffs.

53.     To maintain the conspiracy, the Member Defendants actively took steps to conceal their ownership in Defendants Cornerstone and HHL by utilizing messaging apps and personal

email addresses to conduct Defendants HHL and Cornerstone business on Plaintiffs' dime and fraudulently conceal any disclosure of the clear conflict of interest.

54. The significant overpayments made from Amrize to Defendant HHL during the tenure of the Materials Agreement and the Trucking Agreement, totaling at least $5,174,085, are all tainted by the self-dealing and conflicts of interest concealed by the Member Defendants.

<u>Amrize Discovers Member Defendants' Concealment</u>

55. In December 2024, a whistleblower contacted a Geocycle employee to report Member Defendants' concealment. On December 27, 2024, Amrize's Compliance Department spoke to the whistleblower.

56. Amrize launched a thorough internal investigation through its compliance team and confirmed the existence of the multi-year self-dealing scheme. The investigation concluded in early March of 2025.

57. The investigation revealed that, unbeknownst to Plaintiffs, Defendant HHL is made up of three members: George A. Reeves, Jason Green, and Cornerstone Resources Group, LLC. As stated above, Member Defendants are the three members of Defendant Cornerstone.

58. Each of the Member Defendants maintained a Holly Hill Logistics Visa Business credit card.

59. Amrize also discovered through the investigation that the Member Defendants conducted significant resource theft while conducting third-party business utilizing Amrize's time and assets.

60. Member Defendants utilized their "@holcim.com" and "@geocycle.com" email addresses to conduct business of Defendant HHL, both before the Trucking Agreement and the Materials Agreement were executed, and during the term of each of the agreements.

61.     Member Defendants also used messaging platform WhatsApp to conduct Defendant Cornerstone's business and leveraged their access to Amrize's confidential payment and vendor information to ensure they themselves were paid through Defendant HHL.

62.     On October 13, 2023, Member Defendants received a WhatsApp chat in a group called "HHL" that "Just got a 80k deposit from Holcim," and "We are back in black boys" from Reeves. Defendant Brownlee replied "great."

63.     Defendant Fredlake even used his "@holcim.com" email address to file his personal tax return, which included his membership in Defendant Cornerstone.

64.     Furthermore, the investigation uncovered that Member Defendants leveraged Amrize's internal, confidential, and proprietary data, to which they had access solely because of their employment roles in the company, to provide Defendant HHL with an unfair competitive advantage.

### FOR A FIRST CAUSE OF ACTION
**(Civil Violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1964(c))**
**(Against All Defendants)**

65.     Each and every allegation contained in the preceding Paragraphs 1-64 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

66.     As set forth above, and in violation of both 18 U.S.C. §§ 1962(c) and (d), Defendants collectively operated, managed, controlled, and/or otherwise conspired to conduct and/or facilitate the affairs of an enterprise which engaged in a longstanding pattern of racketeering activity and in which each of the Defendants maintained an interest.

67.      Using their memberships in Defendants Cornerstone and HHL, Member Defendants maintained and controlled an ongoing enterprise from 2023 through 2026, in which all Defendants associated together in fact and functioned as a continuing unit to pursue

11

Defendants' conspiratorial purpose and committed overt predicate acts associated therewith.

68. Defendants, individually and collectively, willfully participated in the operation and/or management of the conspiratorial enterprise, including, without limitation, by actively perpetuating the fraud upon Plaintiffs, concealing all evidence of the same, and/or receiving and distributing proceeds associated therewith in order to facilitate the continuation of the conspiracy, while knowing those proceeds to have been stolen, converted, and/or obtained by fraud.

69. Defendants engaged in a continuous pattern of "racketeering activity" as defined by 18 U.S.C. § 1961(1), including, without limitation, the following predicate acts, each of which relates to each other as part of a common plan, and each of which has the same purposes, results, participants, victims, and methods of commission:

    a. Wire fraud, *see* 18 U.S.C. § 1343, including by and through Defendants' actual and reasonably foreseeable use of wire communications in furtherance of a scheme to intentionally defraud Plaintiffs of the value and/or profits associated with the Materials and Trucking Agreements, and/or aiding and abetting in the same; and

    b. Money laundering, *see* 18 U.S.C. § 1957, including by and through Defendants' engagement in financial transactions with money or property, of a value greater than $10,000, knowing the same to involve proceeds from unlawful activity.

70. Defendants' pattern involved a continuous, closed-ended series of the foregoing related predicate acts extending over a substantial period of time, in excess of 2 years.

71. Each Defendant is a culpable "person" within the meaning of the RICO Act, and each intended to engage in the foregoing related predicate acts, and/or willfully and knowingly conspired to engage in the foregoing related predicate acts, with actual knowledge of the fact that the underlying conduct supporting those acts was illegal.

12

72.     As set forth above, Defendants' enterprise, and the related predicate acts underlying the same, involved and affected interstate commerce, including, without limitation, because Defendants used interstate wires and other instrumentalities of interstate commerce to support their racketeering activities.

73.     As set forth above, Defendants fraudulently concealed their misconduct from Plaintiffs from the inception of the scheme in 2023 until its discovery by Plaintiffs in 2025, and Plaintiffs at all times exercised reasonable diligence to discover and remedy its claims.

74.     As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. 1962, Plaintiffs have been injured in their business and property, in amounts to be proven at trial, including, without limitation, the amounts of all net proceeds realized by Defendants from Defendant HHL's fraudulent relationship with Plaintiffs from inception.

75.     Defendants' racketeering activities and related conspiracy were the direct, proximate, "but for" cause of Plaintiffs' injuries.

76.     Pursuant to 18 U.S.C. 1964(c), Plaintiffs are entitled to recover compensatory and treble damages from Defendants in an amount threefold the damages Plaintiffs sustained as a result of Defendants' violations of the RICO Act, in an amount to be proven at trial.

77.     Pursuant to 18 U.S.C. 1964(c), Plaintiffs are also entitled to recover from Defendants their costs of this Action, including, without limitation, their attorney's fees.

**FOR A SECOND CAUSE OF ACTION**
**(Violations of South Carolina Unfair Trade Practices Act, S.C. Code Ann.**
**§ 39-5-10 et seq.)**
**(Against All Defendants)**

78.     Each and every allegation contained in the preceding Paragraphs 1-77 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

13

79.    At all relevant times, Defendants were engaged in trade and/or commerce as defined by the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-10, et seq.

80.    While acting within the course and scope of Defendants' employment, and while participating in vendor selection, as well as Plaintiffs' general business operations affecting interstate and intrastate commerce, Defendants engaged in unfair or deceptive acts or practices.

81.    Specifically, Member Defendants knowingly failed to disclose direct and/or indirect financial interests with Defendants HHL and Cornerstone, while simultaneously participating in, influencing, and/or recommending Amrize's business dealings with Defendant HHL.

82.    Defendants' unfair and deceptive conduct included, but was not limited to:

a.    Concealing from Plaintiffs material financial relationships and conflicts of interest;

b.    Steering business opportunities to Defendant HHL, in which Member Defendants had an ownership and/or financial interest through Defendant Cornerstone;

c.    Subverting Plaintiffs' bona-fide efforts to engage in competitive bidding by falsely telling Amrize that Defendant HHL was the only vendor in South Carolina that could fulfill the requirements of a serving contract;

d.    Using Plaintiffs' confidential and proprietary insider information to benefit Defendants' outside financial interests;

e.    Concealing from Plaintiffs Member Defendants' self-dealing transactions and communications; and

f.    Causing Amrize to enter into transactions with Defendant HHL under false pretenses and undisclosed material information.

83.    Member Defendants' conduct offended public policy, was unethical and unscrupulous, and constituted unfair and deceptive acts and/or practices within the meaning of

the SCUTPA.

84. Defendants' conduct is capable of repetition and affects the public interest because:

    a. The conduct arose from Defendants' ongoing business and procurement activities;

    b. The concealment of vendor conflicts and self-dealing practices had the likelihood of continuing absent Plaintiffs' discovery of it by a whistleblower report;

    c. Similar deceptive conduct could adversely affect other third-party vendors, customers, and/or employees; and

    d. Member Defendants' conduct created the potential for repeated deceptive transactions in the marketplace.

85. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiffs are entitled to recover actual damages as determined at trial, along with their attorneys' fees and litigation expenses.

86. Because Defendants' actions were willful and knowing violations of the SCUTPA, Plaintiffs are entitled to treble damages pursuant to S.C. Code Ann. § 39-5-140.

**<u>FOR A THIRD CAUSE OF ACTION</u>**
**(Fraudulent Concealment)**
**(Against Member Defendants Gilliam, Fredlake, and Brownlee)**

87. Each and every allegation contained in the preceding Paragraphs 1-86 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

88. At all relevant times, each Member Defendant was employed by Plaintiffs and occupied a position of trust and confidence with access to Plaintiffs' confidential and proprietary records, financial information, and internal business operations.

89. By virtue of Member Defendants' employment relationship and position of trust, Member Defendants owed Plaintiffs a duty to disclose material facts concerning any and all conflicts of interest as required by Plaintiff's Conflict of Interest Policy ("COI Policy").

90.     Beginning in or around 2023, Member Defendants knowingly engaged in misconduct, including but not limited to:

a. Concealing from Plaintiffs their ownership of, and financial interest with, Defendants HHL and Cornerstone;

b. Subverting Plaintiffs' competitive bidding process for procuring independent vendors to ensure Defendant HHL and Membership Defendants were awarded a lucrative services agreement with Plaintiffs by misrepresenting to Plaintiffs that Defendant HHL was the only vendor in South Carolina that could perform the requirements of the contract; and

c. Engaging in unauthorized transfers of Plaintiffs' confidential and proprietary information to employees of Defendant HHL.

91.     Member Defendants intentionally concealed the above material facts from Plaintiffs by:

a. Failing to disclose to Plaintiffs their ownership and financial interests with Defendants HHL and Cornerstone as required by the COI Policy;

b. Using encrypted messaging applications to communicate with each other about their self-dealing and the service agreements Defendant HHL entered into with Amrize; and

c. Unlawfully transferring and disseminating Plaintiffs' confidential and proprietary information using their personal email accounts.

92.     Member Defendants not only knew the concealed facts were material, but also knew Plaintiffs were unaware of the misconduct.

93.     Member Defendants concealed such facts with the intent that Plaintiffs would rely upon Member Defendants' omissions and misleading conduct and would refrain from investigating and terminating Member Defendants' employment, and/or taking corrective action. Prior to 2025, Plaintiffs were unaware of the above concealed facts and reasonably relied upon the Member Defendants' omissions, concealment, and course of conduct because Member

16

Defendants occupied positions of trust with Plaintiffs.

94.     Plaintiffs had a right to rely upon Member Defendants' omissions arising from Member Defendants' employment duties, fiduciary obligations, and responsibility for maintaining accurate records and truthful reporting consistent with Plaintiffs' established policies governing its employees.

95.     As a direct and proximate result of Member Defendants' fraudulent concealment, Plaintiffs have suffered damages including loss of funds, operational disruption, and other consequential damages in an amount to be determined at trial.

**FOR A FOURTH CAUSE OF ACTION**
**(Breach of Contract)**
**(Against Member Defendants Gilliam, Fredlake, and Brownlee)**

96.     Each and every allegation contained in the preceding Paragraphs 1-95 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

97.     At all relevant times, Plaintiffs and Member Defendants were parties to valid and enforceable confidentiality, nondisclosure, and non-solicitation agreements ("the Employment Agreements") prohibiting Member Defendants from, among other things, disclosing or using Plaintiffs' confidential and proprietary information, except as necessary for Plaintiffs' business purposes.

98.     Pursuant to the Employment Agreements, confidential information included, without limitation, customer lists, pricing information, trade secrets, internal business strategies, financial information, vendor relationships, and other non-public proprietary information.

99.     The Employment Agreements further required that Member Defendants not engage, directly or indirectly, in any conflict of interest, which included any activity, employment, or business venture, whether or not for remuneration, that is competitive with Plaintiffs' business,

17

deprives Plaintiffs of any business opportunity, conflicts with Plaintiffs' business interests or is otherwise detrimental to Plaintiffs, or involves any decision or business dealings on behalf of Plaintiffs that might result in a personal gain for Member Defendants or one of their relatives.

100. Plaintiffs performed all conditions and promises required of them under the Employment Agreements, except as excused or waived.

101. Member Defendants materially breached the Employment Agreements by engaging in conduct including, but not limited to:

    a. Engaging in unauthorized transfers of Plaintiffs' confidential and proprietary information to employees of Defendant HHL;

    b. Using Plaintiffs' confidential and proprietary insider information to benefit Member Defendants' outside financial interests;

    c. Failing to disclose their personal and/or financial interests in Defendants HHL and Cornerstone;

    d. Influencing Plaintiffs' business decisions involving undisclosed conflicts of interest;

    e. Using Member Defendants' positions for personal gain;

    f. Diverting Plaintiffs' corporate opportunities and/or benefits obtained through independent, competitive bidding of vendors; and

    g. Concealing such conduct from Plaintiffs.

102. As set forth above, between 2023 and 2025, Member Defendants materially breached the Employment Agreements by disclosing and using Plaintiffs' confidential and proprietary information, failing to disclose their conflicting financial and ownership interests in Defendants HHL and Cornerstone, and defeating Plaintiffs' reasonable expectations regarding Member Defendants' honesty, loyalty, and compliance with company policies.

103. As a direct and proximate result of Member Defendants' material breaches of their Employment Agreements, Plaintiffs have suffered actual damages, including, without limitation,

in the form of lost profits, excessive costs, improper payments, loss of business opportunities, and other damages which Plaintiffs are entitled to recover from Member Defendants in an amount to be proven at trial.

**FOR A FIFTH CAUSE OF ACTION**
**(Tortious Interference with Contractual Relations)**
**(Against Member Defendants Gilliam, Fredlake, and Brownlee)**

104.    Each and every allegation contained in the preceding Paragraphs 1-103 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

105.    At all relevant times, Plaintiffs maintained existing contractual relationships and/or prospective business relationships with various vendors capable of providing goods and services to Plaintiffs on competitive terms.

106.    Member Defendants intentionally concealed their ownership and financial interests in Defendants HHL and Cornerstone from Plaintiffs while participating in procurement and vendor-selection decisions.

107.    Acting outside the legitimate scope of Member Defendants' employment duties, and motivated by personal financial gain, Member Defendants intentionally interfered with Plaintiffs' prospective contractual relationships by:

    a.  Steering contacts and business opportunities away from competing vendors and toward Defendant HHL;

    b.  Concealing material conflicts of interest from Plaintiffs;

    c.  Providing misleading, incomplete, or false information regarding competing vendors;

    d.  Preventing Plaintiffs from obtaining more favorable pricing, quality, or contractual terms from competing vendors; and

    e.  Diverting corporate and economic benefits to Defendant HHL and ultimately to Member Defendants.

108.    Member Defendants' interference was intentional, improper, unjustified, and

19

undertaken for the own personal gain of Member Defendants rather than the legitimate interests of Plaintiffs.

109.    But for Member Defendants' wrongful conduct, Plaintiffs would have entered into and/or maintained advantageous contractual and business relationships with competing vendors and suppliers on more favorable terms.

110.    As a direct and proximate result of Member Defendants' conduct, Plaintiffs suffered damages, including but not limited to payments improperly directed to Defendant HHL, increased procurement and operational costs, lost profits and lost business opportunities, and other consequential and incidental damages in an amount to be determined at trial.

111.    Member Defendants' conduct was willful, wanton, fraudulent, and in reckless disregard of Plaintiff's rights, thereby entitling Plaintiffs to recover punitive damages under the law.

**FOR A SIXTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**(Against All Defendants)**

112.    Each and every allegation contained in the preceding Paragraphs 1-111 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

113.    Plaintiffs conferred certain benefits upon Defendants, including, without limitation, payments directly made to Defendant HHL, and indirectly made to Defendant Cornerstone; business opportunities directed to Defendant HHL; access to Plaintiffs' confidential and proprietary information; and other financial and commercial benefits arising from Plaintiffs' business operations.

114.    Defendants knowingly accepted, retained, and benefitted from those benefits.

115.    The benefits conferred upon Defendants were obtained through improper,

inequitable, and deceptive conduct, including, but not limited to:

      a. Member Defendants failing to disclose their financial interests with Defendants HHL and Cornerstone;

      b. Self-dealing and conflicted business transactions;

      c. Misuse of Plaintiffs' confidential and proprietary information;

      d. Concealment of material facts relating to vendor payments; and

      e. The steering and diversion of business opportunities for Defendants' personal financial gain.

116. Upon information and belief, Defendants received profits, payments, and compensation, and other economic advantages as a direct result of the wrongful conduct alleged herein.

117. It would be unjust and inequitable for Defendants to retain the benefits obtained through their misconduct without compensating Plaintiffs.

118. All Defendants are jointly and severally liable for the unjust enrichment because they received proceeds and compensation directly from Plaintiffs, and thereby directly benefitted from their scheme to defraud Plaintiffs, such that they have each been unjustly enriched by money which in justice and equity belongs to Plaintiffs.

119. As a direct and proximate result of the foregoing, Plaintiffs are entitled in equity to recover from Member Defendants the benefits they unjustly realized in an amount to be proven at trial.

**FOR A SEVENTH CAUSE OF ACTION**
**(Conversion)**
**(Against Member Defendants Gilliam, Fredlake, and Brownlee)**

120. Each and every allegation contained in the preceding Paragraphs 1-119 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

121. At all relevant times, Plaintiffs owned title to, and were entitled to possession of,

21

proprietary, confidential, and/or non-public information that Member Defendants had access to, including, but not limited to:

    a. Electronically stored company data and records;

    b. Pricing information and financial data;

    c. Vendor relationships and supplier data;

    d. Sensitive product testing and analyses;

    e. Prospective business opportunities; and

    f. Other competitively sensitive business information maintained in Plaintiffs' systems, devices, and records (collectively "the Property").

122. The Property constituted valuable business assets developed, maintained, and owned exclusively by Plaintiffs.

123. Member Defendants obtained access to the Property solely through their employment relationship and for the limited purpose of performing duties on behalf of Plaintiffs.

124. Without Plaintiffs' authorization, Member Defendants intentionally exercised dominion and control over the Property inconsistent with Plaintiffs' ownership rights by:

    a. Transferring and/or removing confidential and sensitive files and data, including but not limited to proprietary product testing conducted by Plaintiffs;

    b. Using Plaintiffs' proprietary information for Member Defendants' personal benefit, the benefit of Defendants HHL and Cornerstone, and/or the benefit of other third parties;

    c. Diverting or exploiting the Property for unauthorized purposes; and

    d. Otherwise wrongfully depriving Plaintiffs of the exclusive use and control of the Property.

125. Member Defendants' conduct constituted a wrongful exercise of ownership, dominion, and control over Plaintiffs' Property in exclusion of, and inconsistent with, Plaintiffs' property rights.

126. Plaintiffs did not authorize Member Defendants' retention, disclosure, or

22

exploitation of the Property for any purpose outside the scope of Member Defendants' employment duties.

127. All Defendants are jointly and severally liable for conversion because they each jointly received portions of the proceeds arising from the use and disclosure of the Property wrongfully converted, jointly participated in the wrongful acts underlying the conversion as set forth above, and/or jointly received such proceeds, in accordance with a prior conspiratorial agreement relating to Member Defendants' acts of conversion and the sharing of the proceeds associated therewith.

128. As a direct and proximate result of the foregoing, Plaintiffs are entitled to recover actual and compensatory damages from Member Defendants in the amount of all net proceeds they wrongfully realized as a result of their conversion of the Property, in an amount to be proven at trial.

129. Because Defendants' actions with respect to the conversion of Plaintiffs' property were willful, wanton, and reckless, Plaintiffs are entitled to recover punitive damages from Defendants.

## FOR AN EIGHTH CAUSE OF ACTION
### (Civil Conspiracy)
### (Against All Defendants)

130. Each and every allegation contained in the preceding Paragraphs 1-129 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

131. As set forth above, Defendants combined and conspired for the primary purpose of injuring Plaintiffs in their business and property.

132. In furtherance of their conspiracy, Member Defendants committed numerous overt and unlawful acts (and/or lawful acts by unlawful means) designed to enrich themselves at the

expense of Plaintiffs through: (i) undisclosed ownership and financial interests with HHL through Cornerstone, (ii) self-dealing transactions, (iii) misuse of Plaintiff's confidential and proprietary information, and (iv) deceptive business practices.

133.    Member Defendants jointly assented and agreed to act in concert in carrying out their unlawful acts in furtherance of the conspiracy, pursuant to a common design with a primary purpose to harm Plaintiffs and thereby enrich themselves by, including but not limited to:

a.    Using their positions as employees of Plaintiffs to influence and/or steer business opportunities and payments to Defendant HHL;

b.    Concealing their financial interests and conflicts of interest from Plaintiffs;

c.    Knowingly accepting and benefitting from improperly obtained business opportunities and Plaintiffs' confidential information; and

d.    Financially benefitting from the concealment and self-dealing conduct.

134.    As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs suffered actual, compensatory, and/or special damages, including, without limitation, lost profits, reputational damages, and investigatory costs, which damages Plaintiffs are entitled to recover from Defendants in an amount to be proven at trial.

135.    Because Defendants' actions with respect to their civil conspiracy were willful, wanton, and reckless, Plaintiffs are entitled to recover punitive damages from Defendants.

### FOR A NINTH CAUSE OF ACTION
**(Breach of the Duty of Loyalty)**
**(Against Member Defendants Gilliam, Fredlake, and Brownlee)**

136.    Each and every allegation contained in the preceding Paragraphs 1-135 is repeated, realleged, and reasserted as if fully set forth verbatim herein.

137.    At all relevant times, Member Defendants were employed by Plaintiffs and owed Plaintiffs common-law duties of loyalty, honesty, and fair dealing.

138.    Member Defendants willfully and materially breached their respective duties of

loyalty to Plaintiffs by engaging in conduct, including but not limited to:

    a. Secretly maintaining financial and ownership interests with Defendants HHL and Cornerstone;

    b. Concealing their conflicts of interest from Plaintiffs; and

    c. Misappropriating Plaintiffs' confidential and proprietary information for Member Defendant's own interests.

139. As a direct and proximate result of their respective breaches of their duties of loyalty, Plaintiffs have suffered actual, compensatory, and special damages, among other general damages recoverable at law, and Plaintiffs are entitled to recover such damages from Member Defendants in an amount to be proven at trial.

140. As a direct and proximate result of their breach of their duty of loyalty, Plaintiffs are also entitled to recover the disgorgement of all wages paid to Member Defendants during the periods of time in which they engaged in disloyal acts.

141. Because Member Defendants' actions regarding their respective breaches of the duties of loyalty were willful, wanton, and reckless, Plaintiffs are entitled to recover punitive damages from each Member Defendant.

THEREFORE, having fully complained of Defendants HHL, Cornerstone, Gilliam, Freedlake, and Brownlee, Plaintiffs pray for judgment against Defendants, jointly and severally, with the following particular relief:

    (a) That Plaintiffs be provided a jury trial on all claims so triable against Defendants;

    (b) That Plaintiffs be awarded actual, compensatory, and consequential damages arising from its claims;

    (c) That Plaintiffs be awarded treble damages, costs and attorneys' fees on its civil RICO Act and SCUTPA claims;

    (d) That Plaintiffs be awarded punitive damages;

    (e) That Plaintiffs be awarded the amount of Defendants' unjust enrichment;

25

(f) That Plaintiffs be awarded prejudgment interest;

(g) That Plaintiffs be awarded disgorgement of Defendants' wages and compensation paid to Defendants during the period or their wrongful misconduct; and

(h) That Plaintiffs be awarded such other and further relief as the Court deems just and proper.

s/Nikole Setzler Mergo
Nikole Setzler Mergo (Fed ID No. 7410)
Benjamin N. Garner (Fed. ID No. 11477)
MAYNARD NEXSEN, PC
1230 Main Street, Suite 700 (29201)
Post Office Box 2426
Columbia, SC  29202
PHONE:  803.771.8900
FACSIMILE: 803.253.8277
nmergo@maynardnexsen.com
bgarner@maynardnexsen.com

*Attorneys for Plaintiffs*

May 26, 2026

Columbia, South Carolina

26